IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUDITH SALAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15 C 8139 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Judith Salas brings this action under 42 U.S.C. § 405(g), seeking review of the Social Security Administration's denial of her claim for disability insurance benefits. Both she and the Acting Commissioner of Social Security have moved for summary judgment. For the reasons stated below, the Court grants Salas' motion, denies the Commissioner's motion, and remands the case for further consideration.

**Background**

Until 2009, Salas worked as a presser at a dry-cleaning plant. She stopped working in August of that year, at the age of 48, because of pain in her hands and her knee. According to Salas, her job required her to lift up to twenty pounds and to stand on her feet for most of the day. In 2010, she underwent carpal tunnel release surgery on both hands. Although her hand pain improved temporarily after the surgeries, she still did not believe her hands were sufficiently strong to handle an iron as her pressing job required. She also alleges that in late 2010 or early 2011, she started to experience

1

back pain, which further limited her ability to work.

In April 2012, Salas applied for disability insurance benefits, alleging that her disabling condition has prevented her from working since August 2009. The Social Security Administration denied her benefits request in June 2012 and again in November 2012 upon reconsideration. Salas then requested a hearing, which took place before an administrative law judge (ALJ) on December 12, 2013.

Salas appeared at the hearing without an attorney. The ALJ informed her that she had a right to representation, but she decided to waive that right and to proceed *pro se*, saying: "Well, might as well; I'm here, you know." R. 28. During questioning by the ALJ, Salas explained that she stopped working in 2009 because of her hand and knee pain. She testified that she still has pain in her hands and knees, as well as her back, and that she also suffers from sciatica, which causes pain from her hip down to her foot and makes it difficult for her to walk and stand. Overall, she complained that her pain is "real bad, my bones; all my bones, they're coming up, you know, popping out." R. 42. To treat that pain, Salas said, she takes one pain medication every eight hours and another medication on an as-needed basis, and she attends a "pain clinic" at Stroger Hospital every two months. She told the ALJ that she did not attend school beyond eighth grade and that she has not worked any jobs since she stopped working as a presser in 2009.

In response to the ALJ's questioning, Salas described her current day-to-day activities and capabilities. She said that she is able to use her hands to prepare meals, cook, and brush her teeth but that she cannot lift weights greater than fifteen pounds. She is unable to carry a laundry basket down a flight of stairs, she explained, so she

throws the basket down the stairs to do the laundry, and although she can fold clothes, she does not use an iron at home. She goes shopping with her husband, she said, but she has difficulty walking when she does so. She also stated that she goes to church every Sunday and sometimes visits her sisters in northwest Indiana but said she does not participate in other social or recreational activities.

Before concluding the hearing, the ALJ heard testimony from a vocational expert. The ALJ asked whether an individual who is the same age, has the same work history, and has the same education as Salas would be able to work as a presser if that individual were limited to light work, as defined by regulation, and to "no more than frequent climbing, no more than frequent stooping, kneeling, crouching and crawling" and to "frequent reaching and fingering with the right, dominant, right upper extremity." R. 44. The vocational expert responded that such an individual could perform the job of a presser. If the individual were limited to only "occasional" handling and fingering, as opposed to "frequent," then the individual could not perform the job, according to the vocational expert, and would be limited to working as an usher or a school bus monitor. R. 45. Following the vocational expert's testimony, the ALJ informed Salas that there were medical records missing from her file and told her that he would gather updated records from her treating physician and from Stroger Hospital before reaching his decision on her claim.

Salas' medical records reveal that she suffers from a number of chronic health conditions, many of which cause physical pain. As mentioned above, she had surgeries on both hands to address her carpal tunnel syndrome in September and December of 2010. X-rays from July of that year show that she had minimal narrowing of the joints in

3

her hands and fingers and minimal degenerative changes; x-rays also showed only minimal degenerative changes in her lumbar spine. But notes from visits in 2011 to her treating physician, Dr. Towanda Harris, reflect that, following surgery, Salas still suffered from joint pain in her knees, hips, and legs; high blood lipid levels; decreased strength and a limp in her right knee; osteoarthritis (a degenerative bone disease) in her upper arm; lumbago (lower back pain); and gastroesophageal reflux disease (GERD). During a series of follow-up visits with Dr. Harris, Salas made the following complaints regarding her pain: in January 2012, constant left knee pain, burning in her left foot, and sharp pain in both hands; in April 2012, chronic back and knee pain, as well as abdominal pain over the previous two months; in June 2012, constant right lower back pain and right buttock/hip pain; and in April 2013, pain in her hands and her left foot. To treat Salas' pain, Dr. Harris prescribed tramadol (an opioid pain medication) and ibuprofen in July 2011, Vicodin (a combination of an opioid pain medication and acetaminophen) in January 2012, and acetaminophen and codeine (another opioid pain medication) in June 2012. During this period, Salas also visited the pain clinic at Stroger Hospital, where she complained, at various times, of bilateral knee pain, right shoulder pain, bilateral wrist pain, lower back pain, and pain in her left foot. Doctors at the pain clinic prescribed muscle relaxants, a steroid injection in her back, and gabapentin, an anticonvulsant medication that can be used to treat nerve pain. In addition to describing her pain, Salas also complained of heart palpitations to Dr. Harris in August 2013. At that visit, Dr. Harris noted that Salas suffered from chronic coronary artery disease and referred her to a cardiologist.

    In addition to the X-rays taken before her surgeries in 2010, the administrative

record includes a number of objective medical tests and studies.  In September 2012, Salas had x-rays taken of her right hip, right knee, and spine.  The x-rays of her hip showed mild narrowing of her hip joint but no evidence of fracture or dislocation and an unremarkable right sacroiliac joint.  Her knee x-rays showed mild joint space narrowing and bony productive changes but no fracture or dislocation.  The x-rays of her spine showed mild degenerative changes in the lumbar spine, normal curvature of the lumbosacral spine, some mild multilevel degenerative changes of the thoracolumbar spine, mild intervertebral disc space narrowing at one level, and endplate sclerosis.  The reviewing doctor considered the image of her sacroiliac joint unremarkable.  Salas also underwent a computerized tomography (CT) scan of her abdomen and pelvis in December 2012 because of her complaint about abdominal pain.  The findings from that scan resulted in diagnoses for coronary artery disease, hepatic steatosis (fatty liver disease) and diverticulosis (a condition in which pouches form in the wall of the large intestine).  In June 2013, Salas underwent a magnetic resonance imaging (MRI) scan of her lumbar spine.  The MRI returned the following findings:

> There is mild straightening of normal lumbar lordosis. The vertebral bodies heights are maintained.  Mixed modic types I and III degenerative changes involving anterior inferior vertebral endplate of T12.  Partial desiccation of the intervertebral disks at TL2/L1 and L1/L2.  The distal thoracic spinal cord is intact with the conus medullaris at the level of L1.  Diffuse posterior subcutaneous tissue edema overlying the lumbar spine.
>
> Diffuse epidural lipomatosis at the levels of L5 through S2.
>
> The rest [of the] specific findings at different levels are as follows:
>
> L1/L2 and L2/L3 and L3/L4:  No disc herniation or spinal canal or neuroforamina stenosis.  Mild bilateral degenerative facet arthropathy.[1]

---

[1] "Facet arthropathy" refers to degeneration or arthritis in the spine's "facet" joints, the small stabilizing joints located between and behind adjacent vertebrae.

> L4/L5: Mild circumferential disc bulge with small posterocentral disc protrusion effacing ventral epidural fat. No spinal canal or neurofamina stenosis. Moderate bilateral degenerative facet arthropathy.
>
> L5/S1: Mild posterior disc bulge partially effacing ventral epidural fat. No spinal canal or neuroforamina stenosis. Moderate to marked bilateral degenerative facet arthropathy.

R. 331.

The administrative record also includes medical reports and assessments from a number of physicians who either treated Salas or reviewed her medical files. For example, Dr. M.S. Patil, a state agency medical consultant, completed an evaluation after examining Salas in December 2010 in connection with another claim for disability benefits. Dr. Patil found that Salas had mild weakness in her right hand and mild difficulty opening door knobs and squeezing a blood pressure cuff and that she had some difficulty walking on her heels, walking on her toes, getting up on and off of a table, and squatting. Dr. Patil also noted that Salas's body mass index (BMI) was over 47, qualifying her as "extremely obese." R. 168. But the examination revealed few other abnormal or remarkable findings. Another state agency consultant, Dr. Dante Pimentel, examined Salas in June 2012. Following the examination and his review of Salas' medical history, Dr. Pimentel diagnosed her with carpal tunnel syndrome status post-corrective surgery; degenerative joint disease in both hands, both knees, and both hips (per Salas' report); hypertension; GERD; and obesity. Dr. Pimentel noted that Salas was "morbidly obese" and had a BMI of 47.2. R. 237. He also indicated that although Salas had little difficulty with fine and gross manipulations with her left hand, she had severe difficulty buttoning and zipping with her right hand. He concluded his report with a "conservative estimate of [Salas'] functional ability," finding that her "ability

6

to handle work-related activities is impaired," that she could sit and stand and walk greater than 50 feet unassisted, and that her "ability to lift, carry, and handle objects with her hands is impaired." R. 237.

Dr. Harris, Salas' treating physician, completed a questionnaire concerning Salas' functional capacity in April 2011. In the questionnaire, Dr. Harris indicated that she had treated Salas for approximately five years and had seen her every two to three months during that period. She listed carpel tunnel syndrome and osteoarthritis in the shoulders, hips, hands, and knees and as Salas' primary diagnoses, and she noted that Salas suffered from "severe, throbbing, stabbing" pain in her arms, shoulders, hips, and right knee. R. 173. She checked a box to indicate that she thought Salas would "constantly" experience pain severe enough to interfere with the attention and concentration needed to perform even simple work tasks, and she estimated that Salas would be able to walk only three city blocks without rest or severe pain, that she could sit for only one hour at a time, and that she could stand for only twenty minutes at a time. Dr. Harris indicated that Salas did not have significant limitations reaching, handling, or fingering but that she would be limited to lifting and carrying less than ten pounds occasionally and lifting up to twenty pounds rarely.

The administrative record also includes reports from Dr. James Hinchen and Dr. Francis Vincent, state agency physicians who did not examine Salas but who reviewed her medical records in June 2012 and October 2012, respectively. Dr. Hinchen listed carpal tunnel syndrome as a severe diagnosis and listed unspecified arthropathies and obesity as non-severe diagnoses, and he ultimately determined that Salas was not disabled and could engage in light work. He found Salas' statement of her symptoms to

7

be only partially credible when he compared her alleged symptoms with the totality of the evidence in her file. He also gave Dr. Pimentel's opinion partial weight because it lacked substantial support from evidence in the record and overestimated the severity of Salas' limitations. Dr. Hinchen determined that Salas could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, and could stand for a total of six hours and sit for a total of six hours in a given work day. Dr. Hinchen also determined that Salas could engage in frequent climbing, stooping, kneeling, crouching, and crawling, and although she could engage in only limited fingering with her right hand, she was otherwise unlimited in reaching, handling, fingering, and feeling. Dr. Vincent made nearly identical findings concerning Salas' abilities and her capacity for light work, and he also opined that Salas could perform her past work as a presser. In a very brief case analysis, Dr. Kenneth Glass, another state agency physician, reviewed Salas' medical records in February 2013 and noted that she had some decreased range of motion in her lumbar spine and had limited fine and manipulative functions for right hand fingering. Dr. Glass ultimately concluded that the medical evidence supported the determination that Salas could engage in light work with limitations for right hand fingering.

The ALJ issued a decision denying Salas' benefits claim in May 2014. To reach that conclusion, the ALJ employed the Social Security Administration's required five-step sequential evaluation process. *See* 20 C.F.R. 404.1520(a). At step one, the ALJ determined that Salas had not engaged in gainful work activity since August 6, 2009. He proceeded to step two, at which he determined that Salas had the following severe impairments: coronary artery disease, right knee arthritis, low back pain, right hand

arthritis, carpal tunnel syndrome status post carpal tunnel surgery, obesity, diverticulosis, left foot pain, hepatic steatosis, hypertension, and GERD. At step three, the ALJ found that Salas' impairments did not meet or equal the severity of any of the listed criteria for an automatic finding of disability. The ALJ then determined that Salas possessed the residual functional capacity to perform light work as defined by 20 C.F.R. 404.156(b), except that she would be limited to "frequent climbing, stooping, kneeling, crouching and crawling, and with no more than frequent handling and fingering with the upper right extremity." R. 17. He also determined that she could not be exposed to environmental hazards such as dangerous moving machinery or unprotected heights. Based on this residual functional capacity, the ALJ concluded, at step four, that Salas was capable of performing her past relevant work as a presser and that she was therefore not disabled under the Social Security Act.

In assessing Salas' residual functional capacity, the ALJ made determinations about Salas' credibility and about the weight to give the opinions of the various physicians who evaluated her. The ALJ found that Salas was not "entirely credible regarding her alleged symptoms and limitations." R. 19. Though acknowledging that Salas had some pain and limitation, the ALJ opined that the medical record did not support Salas' allegations regarding the degree of her pain and limitation. Specifically, the ALJ noted that Salas' treatment had been conservative, that her symptoms appeared to be "episodic in nature," and that the objective examination findings and the results of her extensive imaging studies were "largely unremarkable." R. 18. The ALJ also noted that although Salas' 2013 MRI studies showed "the most significant findings," they did not reveal any nerve root impingement, irritation, or encroachment, nor any

9

spinal canal or neurofamina stenosis. R. 18. The ALJ also gave "minimal weight" to the opinion of Dr. Harris because he concluded that it was not supported by the "relatively mild objective findings." R. 19. He noted specifically that although Dr. Harris opined that Salas could not sit for more than two hours in an eight-hour workday or stand and/or walk for more than two hours in an eight-hour workday, nothing in the record suggested that Salas was unable to sit or had any significant problems with ambulation. Regarding the opinion of Dr. Pimentel, the ALJ accorded it only "some weight," noting that Dr. Pimentel provided a conservative estimate of Salas' functional ability and failed to quantify Salas' limitations with respect to her extremities. R. 19.

The ALJ accorded "great weight" to the opinions of Dr. Hinchen and Dr. Vincent because he concluded they were supported by the overall record, and the ALJ's own determination of Salas' residual functional capacity largely adopted their recommendations. Salas timely appealed the ALJ's decision, and the Appeals Council denied her request for review in July 2015. Salas then filed suit in this Court and now seeks a remand or outright reversal of the ALJ's decision on the basis that it is not supported by substantial evidence. The Commissioner urges the Court to affirm the ALJ's decision because the ALJ appropriately considered the evidence in the record and provided good reasons for his conclusions. The Court addresses the parties' arguments below.

## Discussion

When the Appeal Council denies review, the ALJ's decision constitutes the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009). A district court may affirm, modify, or reverse the Commissioner's decision, with or without

remanding the cause for a hearing. 42 U.S.C. § 405(g). Upon review, the ALJ's factual findings are conclusive if they are "supported by substantial evidence." *Id.* The Supreme Court has defined "substantial evidence" to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Although the standard of review is deferential, a reviewing court must conduct a critical review of the evidence before affirming an ALJ's determination. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). The ALJ need not discuss every piece of evidence but must "build a logical bridge from evidence to conclusion." *Villano*, 556 F.3d at 562. In addition, if the decision lacks adequate discussion of the issues, it must be remanded. *Id.* For the reasons discussed below, the Court concludes that the ALJ's decision, and thus the Commissioner's decision, is not supported by substantial evidence and must be remanded for further proceedings.

**A.      Consideration of the 2013 MRI results**

Salas' strongest argument is that the ALJ erred by failing to submit the results of her 2013 MRI to medical scrutiny. The Seventh Circuit has expressly ruled that an ALJ's failure to submit new and potentially decisive medical evidence to medical scrutiny is a fatal error. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In *Goins*, as in this case, the ALJ relied upon the conclusions of consulting physicians who had not examined the plaintiff and who had not viewed the report of her most recent MRI. *Id.* Although a previous MRI had shown that the plaintiff in *Goins* had degeneration in one disc in her spine, the later MRI showed degeneration all along the cervical and lumbar regions of her spine as well as Chiari I malformation (a condition in which brain tissue extends into the spinal canal). *Id.* The Seventh Circuit concluded

11

that the ALJ's decision to evaluate the new MRI herself instead of obtaining a medical report on those results was a "critical failure" that warranted remand. *Id.* at 682; *see also Stage v. Colvin*, 812 F.3d 1121,1125 (7th Cir. 2016) (ALJ erred by relying on non-examining physician's outdated assessment and by evaluating, himself, the significance of new report showing need for a hip replacement and evidence of further spinal degeneration).

This case resembles *Goins* and *Stage*. The ALJ in this case relied heavily upon the assessments of Drs. Hinchen and Vincent, neither of whom examined Salas or reviewed the 2013 MRI results. Those results showed mild degenerative facet arthropathy at three levels of her spine, moderate degenerative facet arthropathy at one level of her spine, and "moderate to marked" degeneration facet arthropathy at another level. R. 331. Without submitting the MRI results for assessment by a physician, the ALJ himself concluded that the results of Salas' imaging studies were "largely unremarkable." R. 18. The ALJ noted specifically that the MRI showed no nerve root impingement, irritation, or encroachment, and no spinal canal or neuroforamina stenosis. But the significance of the MRI's findings or lack thereof is not a subject on which the ALJ is qualified to opine. "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014). The MRI results showed increased degeneration in Salas' spine and could provide objective support and an explanation for her complaints about lower back pain. Such new and potentially decisive evidence should have been submitted to medical scrutiny.

The Commissioner contends that *Goins* and *Stage* are distinguishable because the new medical evidence at issue in those cases revealed more severe findings that were more likely than the findings from Salas' 2013 MRI to be potentially decisive. The Court disagrees. It is precisely because the MRI results have not been submitted to medical scrutiny that the Court cannot say whether or not they would be decisive. Although Salas' MRI results do not show degeneration at all levels of her spine, as the MRI showed in *Goins*, Salas' 2013 MRI is the first study to reveal moderate and "moderate to marked" degeneration in her spine. Thus Drs. Hinchen and Vincent, whose opinions the ALJ gave "great weight," did not have the opportunity to consider how such findings would affect Salas' functional capacity. A medical expert's opinion is necessary to determine the significance of those findings. The Court also rejects the Commissioner's argument that Salas is "cherry picking" evidence by focusing on the abnormal findings in her 2013 MRI while ignoring the milder findings from previous imaging studies. It is entirely reasonable for Salas to focus on the 2013 MRI findings because they are more recent findings, indicating that Salas' condition has become worse over time, and because those are the findings that have not yet been submitted to medical scrutiny. Under *Goins*, the ALJ's failure to submit the MRI results to a medical expert for analysis requires remand.

**B.     Weight given to medical opinion evidence**

Salas also contends that the ALJ erred by failing to provide adequate reasons for discounting the medical opinion of Dr. Harris. The Court agrees. A treating medical source's opinion should be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

13

other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). In this case, the ALJ determined that Dr. Harris's opinion was not supported by objective evidence in the record and thus did not give her opinion controlling weight. But "[e]ven if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The applicable regulations require the ALJ, in making that determination, to consider (1) the length of the treatment relationship and the frequency of treatment, (2) the nature and extent of the treatment relationship, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's specialization, and (6) other relevant factors. 20 C.F.R. § 1527(c)(2).

Seventh Circuit authority is unclear about whether an ALJ's consideration of this checklist of factors must be expressly set out in the ALJ's ruling. *Compare Campbell*, 627 F.3d at 308 (noting that although the ALJ indicated that she considered opinion evidence in accordance with § 1527, the decision "does not explicitly address the checklist of factors as applied to the medical opinion evidence"), *and Scrogham v. Colvin*, 765 F.3d 685, 697–98 (7th Cir. 2014) ("The ALJ here should have addressed these factors in her opinion to enable us to review whether she engaged in the correct methodology."), *with Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing [the physician's] opinion, . . . [the court's] inquiry is limited to whether the ALJ sufficiently accounted for the factors."). In her response brief, Commissioner does not address Salas' argument that the ALJ committed reversible error by failing to consult the required checklist of factors to weight Dr. Harris' opinion.

The ALJ's decision in this case does not include any mention of the checklist factors. The Court concludes that even if the ALJ was not required to expressly consider each of the factors, he still failed to provide an adequate explanation for his decision to accord Dr. Harris' opinion "minimal weight" while giving "great weight" to the opinions of Drs. Hinchen and Vincent. The ALJ did not address the fact that Dr. Harris had treated Salas for approximately five years and had seen her every two to three months, or that Drs. Hinchen and Vincent, on the other hand, had not actually examined Salas. And although the ALJ opined summarily that the opinions of Drs. Hinchen and Vincent were more consistent with the overall record in Salas' case, he offered little explanation for this conclusion. He did not explain why, for example, a morbidly obese individual who has been diagnosed with osteoarthritis and coronary artery disease, and has been prescribed narcotics to treat her pain, reasonably could be expected to engage in frequent climbing, stooping, kneeling, crouching, and crawling, as Drs. Hinchen and Vincent concluded she could. On its face, that conclusion "strains credulity." *Stage*, 812 F.3d at 1126. The ALJ conceivably may be justified in giving the opinions of Drs. Hinchen and Vincent more weight than the opinion of Salas' treating physician, but that conclusion requires a more substantial explanation than the ALJ provided.

## C. Determination of Salas' credibility

The ALJ also determined that Salas' descriptions of her own pain and limitations were only partially credible because they were not supported by "the overall evidence of record, including exam findings and imaging evidence." R. 18. A reviewing court gives an ALJ's credibility determination "special, but not unlimited, deference." *Shauger v.*

*Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). The Seventh Circuit has cautioned specifically that "[a]n ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results." *Pierce v. Colvin*, 793 F.3d 1046, 1049–50 (7th Cir. 2014). The ALJ in this case based his credibility determination on the lack of objective evidence, as well as his belief that Salas' treatment had been conservative and his opinion that many of her symptoms appeared "episodic in nature." R. 18. The ALJ did not, however, provide support for these opinions. Though the ALJ characterized Salas' symptoms as "episodic in nature," the medical records from her visits to Dr. Harris and the Stroger pain clinic reveal that she consistently complained of pain in her knee and back, and periodically complained of pain in her wrist, shoulder, and hip. And although the ALJ characterized Salas' treatment as conservative, he did not address the fact that Salas has been consistently treated with opioid medications to manage her pain. *See Stage*, 812 F.3d at 1125 (indicating that prescription of strong pain medications may substantiate pain allegations). On remand, the ALJ should make "reasoned assessments of [Salas'] credibility." *Id.* at 1127.

**D.     Consideration of effects of obesity**

The Court also agrees with Salas that the ALJ failed to give proper consideration to the effects of her obesity when determining her functional capacity. When making a disability determination for an obese, arthritic claimant, an ALJ is required to consider the effect of obesity on the claimant's arthritis. *See Villano*, 556 F.3d at 562. In his decision, the ALJ stated that he considered obesity but noted that the record shows that Salas was able to "sufficiently ambulate and that she has no significant heart related

16

symptoms such as chest pain or significant shortness of breath." Lack of evidentiary support for an inability to ambulate, however, is not a sufficient ground to give "meager attention to the plaintiff's obesity." *Goins*, 764 F.3d at 681. The ALJ himself found that Salas' "severe impairments" included right knee arthritis, low back pain, left foot pain, and obesity. R. 11. He was required to consider how Salas' obesity would affect these other "severe" impairments. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) ("Even if [the claimant's] arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both.").

The Commissioner contends that even if the ALJ failed to give proper consideration to the effects of Salas' obesity, that failure constitutes harmless error because the ALJ adopted limitations suggested by Drs. Hinchen and Vincent who themselves were aware of her condition. The adoption of those limitations, "combined with the claimant's failure to specify how [her] obesity further impaired [her] ability to work, ma[kes] the error harmless," the Commissioner argues. *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). The Court disagrees. As Salas points out, Drs. Hinchen and Vincent determined that her obesity was "non-severe." R. 52, 63. This conflicts with the ALJ's own determination that Salas' obesity was a "severe" impairment. R. 11. The ALJ, however, did not explain why he reached a different determination than Drs. Hinchen and Vincent or how that determination affected the weight he accorded their opinions. In addition, Drs. Hinchen and Vincent do not themselves explain why their assessments of Salas' functional capacity are consistent

17

with her morbid obesity. The ALJ's reliance on the opinions of state agency physicians cannot excuse his failure to consider the effect of Salas' obesity when "the state agency physicians . . . in and of themselves, are deficient in discussing the aggregate effect of the Plaintiff's obesity." *Spicher v. Colvin*, No. 1:13-CV-304-TLS, 2015 WL 4714293, at *5 (N.D. Ind. Aug. 7, 2015). As discussed above, on its face, the ALJ's conclusion that a morbidly obese person who suffers from arthritis could work at a job that requires prolonged standing, let alone the determination that she could engage in frequent crawling, climbing, stooping, kneeling, crouching, and crawling, is a conclusion that "strains credulity." *Stage*, 812 F.3d at 1126. To support such a determination, the ALJ must "build a logical bridge from evidence to conclusion." *Villano*, 556 F.3d at 562.

## Conclusion

For the reasons stated above, the Court concludes that the ALJ's decision is not supported by substantial evidence and therefore grants Salas' motion for summary judgment [dkt. no. 16] and denies the Commissioner's motion for summary judgment [dkt no. 27]. The Clerk is directed to enter judgment vacating the Commissioner of Social Security's decision denying plaintiff's claim for disability benefits remanding the matter to the Commissioner for further consideration in light of this decision.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 12, 2016